Betty L. DICKERSON, Legal Representative of a minor Shakia Tanyka Dickerson, Petitioner,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 91–204V.

United States Court of Federal Claims.

May 21, 1996.

Paul M. Vincent, Washington, DC, for Petitioner.

Aristia Karas, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for Respondent.

## OPINION

MEROW, Judge.

This matter comes before the Court on Petitioner's Motion for Review of Special Master John F. Edwards' dismissal of her claim for compensation under the National Childhood Vaccine Injury Act of 1986, as amended, 42 U.S.C. §§ 300aa–1–34 ("Vaccine Act" or "Act"). Petitioner seeks compensation for injuries allegedly resulting from the administration of a DTP vaccination. After careful review of the record presented, it is concluded that this matter is to be remanded for further consideration pursuant to 42 U.S.C. § 300aa–12(e)(2)(C).[1]

## I. FACTUAL BACKGROUND

Petitioner, Ms. Betty L. Dickerson, filed a claim on behalf of her daughter Shakia Tanyka Dickerson (Shakia) on January 29, 1991. Shakia was born on October 31, 1984 at Saint Joseph Hospital in Towson, Maryland and was considered to be generally healthy at that time. Ms. Dickerson had experienced an uneventful pregnancy and delivered by caesarean section. At Shakia's first pediatric visit on December 10, 1984, a physician found her to be healthy and developing normally.

When Shakia was approximately 2 and ½ months of age, on January 17, 1985, she received her first administration of the diphtheria-tetanus-pertussis ("DTP") vaccine. The vaccine was administered at the Pediatric Outpatient Clinic of St. Joseph Hospital. Both of Shakia's parents were present.

Shakia's mother has submitted a sworn affidavit stating that Shakia began "shaking very hard" for some 40 minutes immediately after the administration of the DTP vaccine. Ms. Dickerson states that she and Shakia's father, George Thompson, were asked to remain at the hospital some 50 minutes until the shaking episode subsided and before hospital staff gave them the permission to take Shakia home. Ms. Dickerson maintains that she had never seen Shakia behave this way previously. Although Petitioner states that hospital personnel may recall this episode, she did not produce any medical records documenting this assertion. Further, she explains that Shakia's father is "estranged" and therefore she has not been able to obtain his testimony.

Four days later, on January 21, 1985, Petitioner again observed behavior that she

---

1. References to the provision will hereinafter be made by section number only.

found to be remarkable when Shakia awakened at approximately 6:00 am for a feeding. She noticed that Shakia's eyes were "rolling back in her head" and that she would not hold her head steadily. Petitioner claims that when she tried to lay Shakia down after her feeding, Shakia experienced what she terms as a seizure which lasted about 15 minutes. Petitioner called an ambulance, however the episode had concluded by the time the paramedics arrived.

Then again, about one hour later at approximately 7:27 am, Ms. Dickerson noted what she described as another seizure. This time she had an ambulance take Shakia to the emergency room at Saint Joseph Hospital.

While at the hospital, Shakia was diagnosed with afebrile seizure disorder and was prescribed 7.5 mg Phenobarbital twice a day to control the seizures. Medical records from Saint Joseph Hospital's inpatient pediatric unit recorded that Shakia acted like light "bothers [her] eyes" and that she exhibited jerking of all extremities with each seizure episode as well as increased eye-blinking after the seizures. Upon discharge, Shakia was prescribed 8 mg Phenobarbital twice a day.

On March 7, 1985, Shakia again experienced multiple episodes of jerking movements lasting a couple of minutes followed by periods of lethargy and developed a 101.2 degree fever. Petitioner brought Shakia to Saint Joseph Hospital. Upon admission she was given 15 mg of Phenobarbital. Shakia was discharged on March 11, 1985.

Shakia received a diphtheria-tetanus vaccine on March 18, 1985. Medical records taken subsequent to the aforementioned vaccinations indicate that Shakia's seizure history "coincides with getting DTP." Pet.'s Exh. D at 23. Records of pediatric visits from April 15, 1985 through 1991 document that Shakia regularly experienced seizure episodes. Pet Exh. D at 11, 13–14, 17 and 86; Pet.'s Affid., Pet.'s Exh. E at 2. Petitioner explained in October, 1995 that regular seizure activity continued to occur at the frequency of two to three episodes per week. Pet.'s Expert Decl. at 3.

Throughout the years the medical records indicate that seizures would be marked by shaking, twitching, loss of head control, eyes rolling back into her head, increased eye blinking or unresponsive staring followed by prolonged screaming. Pet.'s Exh. D, at 32. Further, an EEG performed on Shakia on January 27, 1989 was interpreted as "mildly abnormal … due to the presence of epileptiform discharges in the left central region … [commonly seen as] … a so called benign rolandic epilepsy of childhood." Pet.'s Exh. D96.

Shakia took medication to control these symptoms for approximately seven years. First prescribed Phenobarbital during her January, 1985 hospitalization, Shakia continued taking this medication until July 31, 1989 at which time her physician prescribed Dilantin to control the seizure activity. The records indicate that she continued on Dilantin throughout 1992. Pet.'s Exh. L4. Currently Shakia does not take anti-convulsive medication. See Pet.'s Expert Decl. at 3.

The effects of this seizure disorder, according to Petitioner, have been severe and continue to affect Shakia to this day. Shakia, now eleven years old, has a short attention span and continues to experience serious academic difficulties. Her report cards consistently note that she is working below grade level and is functioning in a "below average" capacity in this work. See Pet.'s Exh. O. Shakia has needed continuous tutoring which Petitioner documents from September 1990 through June 1994. Pet.'s Exh. P2. Even with the tutoring, Shakia has progressed only slightly. Ms. Dickerson states that the cost of Shakia's tutoring as well as other costs incurred as a result of Shakia's illness have totalled approximately $3,413.36. Pet.'s Decl. at 2–3.

## II. THE COMPENSATION PROCEEDINGS

In her petition for compensation, Ms. Dickerson first contended that Shakia had suffered a residual seizure disorder "RSD" within the requisite time period as defined by the Vaccine Injury Table ("Table"), codified at 42 U.S.C. § 300aa–14. Petitioner assert-

ed, alternatively, that the DTP vaccination was the actual cause of the RSD.

On July 22, 1994 Respondent, the Secretary of the Department of Health and Human Services ("DHHS"), filed its Preliminary Request for Records. Pursuant to this request and an Order of the Chief Special Master of September 23, 1994, Petitioner filed additional exhibits including medical and elementary school records on November 22, 1994. Petitioner then filed an Amended Petition on January 13, 1995.

After being granted an extension of time, on May 3, 1995 Respondent submitted a Rule 4(b) Report denying that Petitioner had submitted records sufficient to support either an on-Table injury or a causation-in-fact theory.

The Special Master held the first telephonic status conference in this matter on June 7, 1995. No order was issued subsequently, and the Special Master does not discuss the substance of these proceedings in his Decision dismissing Petitioner's claim. Another status conference was held on August 7, 1995. The Special Master issued an order immediately following this conference in which he asked Petitioner to "develop substantively the factual and medical bases of her case." *Dickerson v. Sec'y of DHHS*, No 91–0204V Order (Fed.Cl.Sp.Mstr. Aug. 8, 1995). The Special Master ordered Petitioner to file, "at a minimum," a medical expert's affidavit by October 9, 1995. *Id.* The Special Master further stated,

> At the August 7, 1995 status conference, the special master was frank. On the basis of the current record, and in accordance with existing precedent, the special master would be constrained to conclude that there is no reasonable basis for this claim. § 300aa–15(e)(1). Accordingly, the special master forewarns petitioner that hard analysis of this case is in order with an eye towards dismissal.

*Id.* at n. 1.

Several days prior to the filing deadline set by the Special Master, on October 3, 1995

Petitioner's counsel moved to extend the time for filing the medical affidavit for two months from October 9, 1995 until December 9, 1995. Counsel submitted that an extra two months would be necessary in order to secure an expert to examine Shakia and review her medical records thoroughly. She claimed that her "... difficulty in obtaining the requisite examination and affidavit has been exasperated by the Dickerson's adverse financial condition."

The Special Master held another telephonic status conference on October 12, 1995 at which time he directed Petitioner to file an affidavit of unreimbursed expenses incurred subsequent to vaccination in addition to the medical expert affidavit. Also, the Special Master granted an extension through November 20, 1995 only.

On November 20, 1995 Petitioner's counsel filed a notice of substitution of counsel[2] and two declarations: that of Dr. Michael Van Doren Johnston, a Professor of Neurology and Pediatrics at the John's Hopkins University School of Medicine and the Kennedy Krieger institute as well as that of Petitioner attesting to unreimbursable costs in excess of $1000 incurred as a result of Shakia's seizure disorder.

On November 22, 1995, two days after Petitioner submitted the required declarations, without further notice and without granting the opportunity for a hearing, the Special Master entered a decision dismissing this case. The Special Master reasoned that the evidence presented by Petitioner was insufficient to establish a *prima facie* case of on-Table or actual causation.

Petitioner filed her Motion for Review on December 22, 1995, requesting relief from the Special Master's Decision. In this motion Petitioner contends, generally, as follows: (1) the Special Master's conclusion that a hearing was not necessary in this case was an abuse of discretion; (2) the Special Mas-

---

2. During the approximate calendar year preceding dismissal of this matter, from October 12, 1994 to November 20, 1995, Petitioner sustained three substitutions of counsel, resulting in a situation in which four different attorneys represented her at that critical period in her case. The substitutions have no apparent reflection upon Petitioner's case, but rather, were necessitated by the departures of attorneys from the firm which represents Petitioner. Motion for Substitution of November 20, 1995.

ter's failure to set forth and examine the evidence in "any significant detail" constituted reversible error; (3) the Special Master's finding of fact that Dr. Johnston's declaration was insufficient to support an actual causation theory was arbitrary and capricious; and (4) the Special Master utilized an incorrect legal standard in his inquiry with respect to causation-in-fact.

Respondent argues that Petitioner is not entitled to a hearing because the determination not to grant a hearing lies within the discretion of the Special Master. In addition, Respondent maintains that the Special Master ruled correctly that Petitioner had failed to assert a *prima facie* case.

## III. DISCUSSION

### A. Standard of Review

In ruling upon a motion to review a special master's decision, this Court may, pursuant to § 300aa–12(e)(2),

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or,

(C) remand the petition to the special master for further action in accordance with the court's direction.

■ The United States Court of Appeals for the Federal Circuit has explained that "[t]hese standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment." *Munn v. Sec'y of DHHS*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992), *cited in Cox v. Sec'y of DHHS*, 30 Fed.Cl. 136, 142 (1993). Fact findings are reviewed under the arbitrary and capricious standard, legal questions under the not in accordance with law standard, and discretionary rulings are reviewed for abuse of discretion. *Id.* "The latter will rarely come into play except where the special master excludes evidence." *Id.*

■ With regard to the arbitrary and capricious standard applied to findings of fact, a court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). "If the special master has considered the relevant evidence in the record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of DHHS*, 940 F.2d 1518, 1528 (Fed. Cir.1991).

### B. Statutory Requirements and Burdens of Proof

Eligibility for compensation under the Vaccine Program is determined pursuant to the statutory guidelines set forth in § 300aa–11(c)(1). This provision requires petitioners to show either that the injured person received a vaccine set forth in the Vaccine Injury Table [3] ("Table") and

(C)(i) sustained ... any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine referred to in subparagraph (A) ... and the first symptom or manifestation of the onset ... of any such illness, disability, injury, or condition ... occurred within the time period after vaccine administration set forth in the Vaccine Injury Table, or

(ii)(I) sustained ... any illness, disability, injury or condition not set forth in the Vaccine Injury Table but which was caused by the vaccine referred to in subparagraph (A), or

(II) sustained ... any illness, disability, injury or condition set forth in the Vaccine Injury Table the first symptom or manifestation of the onset ... which did not occur within the time period set forth in the Table but which was caused by the vaccine referred to in subparagraph (A).

§ 300aa–11(c)(1) (emphasis added).

The special master will award compensation in cases where petitioner has demon-

---

**3.** The Vaccine Injury Table is codified at § 300aa–14.

strated these statutory elements by a preponderance of the evidence. *See* § 300aa–13(a)(1). Such an award implicitly requires a determination that there is not a preponderance of the evidence showing that the injury is due to factors unrelated to the administration of the vaccine. *Id.*

Proof by a preponderance has been interpreted to require the production of evidence that makes the existence of a contested fact more likely than not. E. Cleary, McCormick's Handbook on the Law of Evidence, § 339 (1984), *cited in McClendon v. Sec'y of DHHS*, 23 Cl.Ct. 191, 195 (1991).

Further, the Act provides that "[t]he special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." § 300aa–13(a)(1).

Proceedings under the National Vaccine Compensation Program are designed to be informal and non-adversarial. H.R.Rep. No. 908, 99th Cong. 2d Sess., pt. 1 at 3 (Sept. 26, 1986), *reprinted in* 1986 U.S.C.C.A.N. 6344 (establishing a procedure to administer awards "quickly, easily, and with certainty and generosity"); § 300aa–12(d)(2). Under the authority granted by 28 U.S.C. § 2071 and § 300aa–12(d)(2), the Court of Federal Claims has promulgated rules of procedure for use by special masters governed by the principles of fundamental fairness to both parties. *See e.g.*, RCFC Appendix J, Vaccine Rule 8(b) (" . . . special master will consider all relevant, reliable evidence, governed by principles of fundamental fairness to both parties.")

Petitioner's first allegation was that Shakia suffered residual seizure disorder within the Table time frame. RSD is listed on the Table as an injury that is associated with DTP. § 300aa–14. In order to establish the Table presumption that a DTP vaccination has caused an RSD, Petitioner must establish that the first symptom or manifestation of this injury has occurred within three days after the administration of the DTP vaccination. *Id.* Additionally, Petitioner must establish that Shakia

 . . . did not suffer a seizure or convulsion unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahr-

enheit before the first seizure or convulsion following the administration of the vaccine; and

 . . . 2 or more seizures or convulsions occurred within 1 year after the administration of the vaccine which were unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit.

§ 300aa–14(b)(2).

Alternatively, Petitioner alleged that the vaccine actually caused the injury at issue. With regard to proof of actual causation of all alleged vaccine injuries, the statute has been interpreted as requiring a petitioner to present " . . . proof of a logical sequence of cause and effect showing that the vaccine was the reason for the injury." *Grant v. Sec'y of DHHS*, 956 F.2d 1144, 1148 (Fed.Cir.1992).

## C. Table Injury

█ The initial error which Petitioner asserts with respect to her Table Injury claim stems from the Special Master's failure to grant a hearing. Petitioner argues that this denial constituted an abuse of discretion and was in violation of the Vaccine Rules and Act's governing principle of providing a fundamentally fair opportunity to both parties to present their cases.

Respondent counters that the Vaccine Rules indicate that the special master " . . . may decide a case on the basis of written filings without an evidentiary hearing." Vaccine Rule 8(d); *Plummer v. Sec'y of DHHS*, 24 Cl.Ct. 304 (1991). As such, whether to convene a hearing is a discretionary determination.

Although Respondent is correct in asserting that this determination is a discretionary one, it is important to note that this discretion is tempered by the requirement of Vaccine Rule 3(b):

The special master shall be responsible for conducting all proceedings, including requiring such evidence as may be appropriate, in order to prepare a decision, including findings·of fact and conclusions of law . . . [and] shall determine the nature of the proceedings, with the goal of making the proceedings expeditious, flexible, and less

adversarial, while at the same time affording each party a full and fair opportunity to present its case ...

As special masters must "requir[e] such evidence as may be appropriate," it is incumbent upon them to explain to the parties the evidence which is necessary and provide them a reasonable opportunity to come forward with it. The legislative history is directly supportive of such an interpretation of the rule, explaining at length that Congress intended to design the proceedings to be informal and non-adversarial. See H.R.Rep. No. 908, 99th Cong. 2d Sess., pt. 1 at 3 (Sept. 26, 1996), *reprinted in* 1986 U.S.C.C.A.N. 6344 (establishing a procedure to administer awards "quickly, easily, and with certainty and generosity").

The first step in establishing Shakia's on-Table RSD required proving that the first symptom or manifestation of the RSD occurred within three days of Shakia's vaccination. Petitioner provided her own affidavit to support this theory with her Petition in 1991. Her affidavit states that Shakia was shaking very hard in the hospital immediately after vaccine administration for some 40 minutes. Petitioner did not provide any other documentation or evidence supporting this contention.

Under the statute in order to establish an on-Table injury by a preponderance of the evidence, a Petitioner must provide some type of medical evidence. "[T]he special master or court may not make such a finding [in favor of compensation] based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." § 300aa–13(a)(1) (emphasis added). In this respect, the petition filed originally could not support the finding of an on-Table injury.

Petitioner argues in her Motion for Review that the Vaccine Act permits a finding of a first symptom or manifestation of onset of any injury or condition within the Vaccine Injury Table time period, "even though not recorded or incorrectly recorded in the medical records." *Bunting v. Sec'y of DHHS,* 19 Cl.Ct. 738, 751 (1990), *aff'd,* 931 F.2d 867 (Fed.Cir.1991). While this is true, it does not detract from the firm requirement that medical opinion evidence is still necessary in

such case to support an on-Table theory. *Thornton v. Sec'y of DHHS,* 35 Fed.Cl. 432, 440–41 (Fed.Cl.1996); *Summar v. Sec'y of DHHS,* 24 Cl.Ct. 440, 442, 444 (1991) (doctor provides expert opinion that symptoms described during the table period were, indeed, manifestations of the injury alleged). In short, a medical expert opinion is necessary to categorize the reactions described by Shakia's mother as actual manifestations or symptoms of a residual seizure disorder. *See Bunting,* 931 F.2d at 867, 872.

The record reflects that the Special Master made clear to the Petitioner at the August 7, 1995 status conference that she needed to develop the factual and medical bases of her case in order to survive dismissal. *Dickerson v. Sec'y of DHHS,* No 91–0204V Order (Fed.Cl.Sp.Mstr. Aug. 8, 1995). The Special Master gave Petitioner until October 9, 1995 to provide the missing basic elements of her Table claim. Petitioner moved for an extension of time, and the Special Master partially granted it through November 20, 1995.

Despite this admonition, on November 20, 1995, Petitioner submitted an expert declaration—that of Dr. Johnston—which did not address the January 17, 1985 post-vaccine episode at all. Rather, the first symptoms of RSD to which the expert refers in his declaration are the experiences of January 21, 1985.

In his November 22, 1995 Decision the Special Master found Petitioner's showing did not satisfy the basic elements of on-Table causation because Petitioner did not substantiate her claim with either medical records or medical opinion as required by § 300aa–13(a)(1). Consequently, he dismissed Petitioner's on-Table claim.

Under these circumstances, the Special Master did not abuse his discretion in deciding to forego a hearing. At the August 7, 1995 status conference the Special Master provided an explanation of what was necessary to establish Petitioner's on-Table claim as well as a window of opportunity—of two months, then extended to three and one half months—to develop her claim. Nonetheless, Petitioner failed to provide expert medical opinion concerning the episode of January 17,

1995 by the given deadline. Therefore, it is concluded that the Special Master discharged his duty under Vaccine Rule 3(b) to elicit a full record with regard to this first, on-Table claim of RSD. In this circumstance, the Special Master's dismissal without a hearing is considered a reasonable exercise of his discretion.

The second error Petitioner asserts with respect to the on-Table claim discussion in the Decision is that the Special Master failed adequately to set forth and examine the evidence as required in *Hines,* 940 F.2d 1518, 1528 (Fed.Cir.1991). The *Hines* court provides a model for review of fact-finders' determinations under the arbitrary and capricious standard. *See id.* As described above, the Special Master considered the relevant evidence and decided that Petitioner had failed to submit sufficient medical expert evidence to sustain a *prima facie* claim. In such case, only a review of the evidence explaining that it did not satisfy the statutory minimum was possible. Thus, the Special Master's succinct dismissal of this claim cannot be considered to be arbitrary or capricious.

## D. Actual Causation

Petitioner claims that the Special Master acted arbitrarily and capriciously in dismissing the actual causation claim based on his finding that Dr. Johnston's declaration was "patently insufficient", apparently, as a matter of law. The Special Master confined his discussion of this claim to the following four sentences:

> Dr. Johnston's declaration is patently insufficient to carry Ms. Dickerson's burden under an actual causation theory. Dr. Johnston does not discuss any medical or scientific literature that supports his declaration. Instead, Dr. Johnston offers merely a conclusive statement. Thus, Ms. Dickerson has failed to present a *prima facie* actual causation claim.

From this formulation the reader can glean two explanations for dismissal: (1) Petitioner's expert declaration does not contain medical literature, and (2) it is "conclusive." Neither is a sufficient base for summary dismissal of this claim.

■ 1. With respect to the Special Master's assertion that Dr. Johnston's declaration fails for lack of citation to medical literature, the text of the Vaccine Act requires the submission of medical "records" or "opinion." § 300aa–13(a)(1). It does not require the submission of medical literature. Also, the legislative history of the Act requires that "evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate causation for such a petitioner." H.R.Rep. No. 99–908, 99th Cong. 2d Sess., pt. 1 at 15 (Sept. 26, 1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6356 (emphasis added). By submitting Dr. Johnston's declaration, Petitioner fulfilled this requirement.

Further, the only possible explanation for the Special Master's finding that the absence of references to medical literature caused the declaration to fail would be that such absence demonstrated that no medical literature actually does support the expert's assessment. As such, a special master could find that an expert opinion lacked a reasonable basis. *See Perreira v. Sec'y of DHHS,* 27 Fed.Cl. 29 (1992), *aff'd* 33 F.3d 1375 (Fed.Cir.1994) (was permissible to deny attorney's fees pursuant to § 300aa–15(e)(1)(B) because no reasonable basis for claim existed and Petitioner's counsel had not examined whether medical literature supported expert's theory). Petitioner need only make sure that the proffered testimony has grounding in medical literature for it to be considered to have a reasonable basis. *Id.* In the instant case, the Special Master made no indication that Dr. Johnston's theory lacks support in medical literature—he simply stated that none was submitted. That is not the relevant standard.

Upon analysis, absent an explicit order or rule to the contrary (*see e.g., Fed.R.Civ.P.,* 26(a)(2)(B)), it was reasonable for Petitioner to submit a declaration that did not include medical literature considering that the Federal Rules of Evidence do not require experts to come forward with the data supporting their opinions unless the court requires otherwise or they are elicited on cross-examination. Fed.R.Evid. 705. Rule 705 provides,

> The expert may testify in terms of opinion or inference and give reasons therefor

without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Fed.R.Evid. 705. The record reveals only that the Special Master required at the August 7, 1995 conference that Petitioner provide a medical expert affidavit. He did not expressly require that it include medical literature.

The Vaccine Rules provide that "[i]n receiving evidence, the special master will not be bound by common law or statutory rules of evidence." Vaccine Rule 8(b). In not confining the special master to the strictures of the Federal Rules of Evidence, the Vaccine Rules intended to provide the Special Master and the parties additional latitude in the provision and acceptance of evidence. *See Hines*, 940 F.2d at 1525–26. However, by requiring medical literature without explicitly requesting it, the Special Master actually placed a heavier burden on Petitioner than the Federal Rules of Evidence require litigants to carry.

■ 2. The Special Master's second basis for dismissal is that the expert declaration submitted to support Petitioner's causation-in-fact claim was "conclusive" and therefore "patently insufficient." Apart from these general assertions, the Special Master made no specific findings of fact. Nor did he make reference to any of the medical records or tests. *McClendon v. Sec'y of DHHS*, emphasizes the absolute requirement that special masters articulate specific findings. 23 Cl. Ct. 191. The court noted that "... every determination under § 300aa–13(a)(1)(A) ... requires a specific finding of fact, which, in turn, must be substantiated by [reference to] medical records or medical opinion." *McClendon*, 23 Cl.Ct. at 196 (citing § 300aa–13(a)(1)). Findings of fact and conclusions of law are "indispensable prerequisites to effective and timely review" in the Court of Federal Claims. *McClendon*, 23 Cl.Ct. at 196 (citing *Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426, 433 (5th Cir.1977)). A special master is required to "carefully scrutinize the entire record." *Id.* at 198; § 300aa–13(a)(1). Therefore, failure to ex-

amine the full record and provide sufficient findings constitutes error.

The requirement to provide appropriate findings and an analysis is especially applicable to expert testimony. Expert medical testimony cannot be dismissed without providing a "thorough, rational explanation for doing so because to do otherwise would be tantamount to arbitrary and capricious decision-making." *McClendon*, 23 Cl.Ct. at 199 (expert testimony may be rejected for lack of training, experience, or knowledge on the causes and symptoms of the injuries in issue or bias); *see Bunting*, 931 F.2d at 872–73 (reversal for failure to provide sufficient reasons for discounting opinion of petitioner's medical expert); *Ultimo v. Sec'y of DHHS*, 28 Fed.Cl. 148, 151–52 (1993). The Special Master dismissed Dr. Johnston's opinion evidence with a one-word explanation—it was "conclusive." Dismissal without a hearing in this circumstance rises to the level of arbitrary and capricious action as described in *McClendon.*

Further, to the extent that the Special Master takes issue with the substance of the proffered expert opinion for being conclusive, and presumably lacking additional analysis necessary to make full findings, the Vaccine Program places a burden upon the special master to gather such evidence. The Vaccine Rules provide, "... the special master shall be responsible for ... requiring such evidence as may be appropriate in order to prepare a decision including findings of fact and conclusions of law...." Vaccine Rule 3(b). Additionally, a special master must conduct the proceedings expeditiously "... while at the same time affording each party a full and fair opportunity to present its case and creating a record sufficient to allow review of the special master's decision." *Id.*

To establish a *prima facie* case of actual causation, Petitioner must present an affirmative medical theory supporting the logical sequence of cause and effect between the vaccine and the illness. *Grant*, 956 F.2d at 1150; § 300aa–13(a)(1). Petitioner provided an expert opinion from a pediatric neurologist from Johns Hopkins University Hospital on November 20, 1995. However, it appears that the Special Master found that Dr. John-

ston's declaration did not flesh out an affirmative theory as it contained only his rendition of the facts followed by his medical opinion. This prompted the Special Master to dismiss the case in its entirety on November 22, 1995, two days after receipt of Dr. Johnston's opinion.

Considering the record presented, it appears that Petitioner submitted what the Special Master had required: a medical expert declaration addressing causation-in-fact as well as Petitioner's declaration as to unreimbursable expenses. As the Special Master recorded nothing in the preceding record or in his dismissal decision informing the parties to this effect, the record does not indicate that Petitioner was adequately notified that the written submissions would be the totality of the presentations which the Special Master intended to consider. Rather, Petitioner's counsel's allegations in his Motion for Review reveal that he was not aware that there would be no opportunity for a hearing in which to elaborate on the bases for the medical expert's assertions. Petitioner's October 3, 1995 Motion and Memorandum of Points and Authority for Extension of Time (counsel argues that extension is appropriate "because a trial date has not been set"). In this circumstance, before making a determination that the opinion of an apparently reputable expert lacked any basis, considering Vaccine Rule 3(b) it was incumbent upon the Special Master to ascertain the existence or nonexistence of such basis. The sudden dismissal two days after the opinion was submitted was not in accordance with the Act or the applicable Rules.

Moreover, absent an express order to the contrary, the pre-trial proffering of a declaration which contained a medical expert opinion, yet did not provide its full underlying analysis, was reasonable in light of Federal Rule of Evidence 705. *See supra*, Fed. R.Evid. 705 ("... expert may testify in terms of opinion ... without first testifying to the underlying facts or data, unless the court requires otherwise ..."); *see also* Fed. R.Evid. 704(a) ("... testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."). As stated above, the Vaccine Compensation Program's goal is to provide a full and fair opportunity to present one's case with a more liberal approach to the acceptance of evidence than the Federal Rules of Evidence. *See Hines*, 940 F.2d at 1525–26.

The foregoing analysis illustrates that the Special Master did not provide a rational basis for the failures to obtain a complete record and to proceed to fact-finding, or for discounting the expert testimony without allowing or requiring elaboration as to its underlying reasoning. Consequently, his dismissal of Petitioner's causation-in-fact claim lacks the required reasonable basis and constitutes arbitrary and capricious action necessitating a remand. *See id.*, at 1528.

Petitioner has also argued that failure to hold a hearing with respect to this claim was an abuse of discretion. As stated above, whether to convene a hearing is a matter left to the discretion of the special master. Here, however, the Special Master has not taken sufficient action to afford the Petitioner a full and fair opportunity to present her case of actual causation. The Special Master should consider whether a hearing where Dr. Johnston's opinion testimony could be presented, explained and examined would aid in providing a full and fair opportunity for both sides to present their cases. *See* Vaccine Rule 3(b).

**E. Improper Recitation of Statutory Burden of Proof**

█ Finally, Petitioner asserts that the Special Master applied an incorrect burden of proof with respect to both the on-Table and causation-in-fact theories. The Special Master, citing *Grant*, 956 F.2d at 1148, for support, asserted that "as a precondition to compensation, the Act requires the absence of alternative causes." The Act requires, rather, that "there is not a preponderance of the evidence that the ... injury ... is due to factors unrelated to the administration of the vaccine...." It does not require a total absence of alternative causes. § 300aa–13(a)(1)(B).

Although the Special Master's formulation of the standard is imprecise, such error was harmless. Before the Special Master may

even reach the issue of alternative causation, he must make a determination as to whether a petitioner has presented a *prima facie* case of causation. *See McClendon,* 23 Cl.Ct. at 196. As the Special Master dismissed both of Petitioners' claims based on a finding that Petitioner had failed to assert a *prima facie* case, he never reached the determination of alternate causation and never applied his formulation of this standard.

## IV. CONCLUSION

Accordingly, it is **ORDERED** that:

(1) With respect to Petitioner's claim of on-Table injury, the Motion for Review is hereby DENIED;

(2) The Special Master's decision on Petitioner's actual causation claim is set aside; and

(3) This matter is hereby REMANDED pursuant to § 300aa–12(e)(2)(C) for further proceedings, not confined to the instant record, and an ensuing decision by the Special Master with respect to Petitioner's actual causation claim.