Taylor Marie CAMPBELL a minor, by her parents and natural guardians, Lee and Mandy CAMPBELL, Petitioners,

v.

## SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.

No. 02–554 V.

United States Court of Federal Claims.

Filed under seal: Jan. 27, 2006.

Reissued: Feb. 14, 2006[1].

---

1. An unredacted version of this opinion was issued under seal on January 27, 2006. The parties were given an opportunity to propose redactions, but no such proposals were made. Accordingly, the opinion is issued in its original form, with minor corrections.

Clifford J. Shoemaker, Shoemaker & Associates, Vienna, Virginia, for petitioner.

Melonie J. McCall, Torts Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for respondent, with whom was Assistant Attorney General Peter D. Keisler.

## OPINION

ALLEGRA, Judge.

Taylor Marie Campbell and her parents seek review of a decision rejecting their vaccine injury claims under the National Childhood Vaccine Injury Act of 1986, as amended, 42 U.S.C. §§ 300aa–10 *et seq.* (the Vaccine Act). Because the court concludes that the procedures employed by the Special Master were fundamentally unfair, and that her rulings are either inadequately explained or arbitrary and capricious, it remands this matter for further proceedings.

### I. Background

The facts necessary to this ruling relate primarily to the procedures employed below and briefly are stated as follows:

On May 28, 2002, petitioners filed a petition pursuant to the Vaccine Act, alleging that Taylor Campbell suffered a seizure disorder beginning on Monday, May 31, 1999, caused by the acellular DPT vaccine. On August 29, 2003, petitioners submitted an expert report by neurologist Carlo Tornatore of the Georgetown University Hospital. On June 4, 2004, petitioners submitted a supplemental expert report from Dr. Tornatore, as well as a copy of his curriculum *vitae.* On July 7, 2004, the Special Master ordered petitioners to continue efforts to procure an expanded expert report from Dr. Tornatore and to submit an updated affidavit from the parents. On July 26, 2004, the Special Master ordered petitioners to submit an expanded expert report by August 17, 2004. No further expert reports were submitted. However, on August 27, 2004, petitioners filed supplemental medical literature in support of Dr. Tornatore's report. On November 1, 2004, respondent filed the report of its expert, neurologist Bennett L. Lavenstein, M.D., along with a copy of his curriculum vitae. On December 22, 2004, the case was assigned to a new special master.

On June 9, 2005, the Special Master issued an order scheduling a status conference on June 15, 2005, and, *sua sponte,* filed a preliminary ruling listing certain key facts to which she attached, as exhibits, nine articles relating to seizure disorders and fevers.

Those exhibits neither had been submitted nor validated by either of the parties or their experts, but apparently had been found by the Special Master while exploring the Internet. On June 15, 2005, an unrecorded status conference was held at which the Special Master reputedly indicated her intention to dismiss the case if petitioners were unable to produce any records indicating that Taylor had a fever with her seizures.[2] Petitioners had already filed a complete medical record and at least two affidavits by Taylor's mother in which she stated that Taylor had experienced febrile seizures, but they did not have any further records to support their claim. Accordingly, they did not file any further exhibits.

On June 30, 2005, the Special Master issued a decision denying petitioners' claim. Although the Special Master had not conducted an evidentiary hearing, she found the affidavits by Taylor's mother "not credible." The Special Master noted that the affidavits were not supported by the medical records, which recited that Taylor had a fever after receiving the vaccine, but did not note that she had a fever on the day the seizures began. Although recognizing that Taylor's mother had been traumatized by the seizures—the record includes a videotape of Taylor's mother weeping over her seizing child on June 1, 1999—the Special Master, nonetheless, took the view that had the mother observed a fever when the seizures occurred on May 31, she would have indicated this to the medical personnel and the records would have so reflected. And the Special Master reached this conclusion—again without a hearing—even though the contemporaneous medical records from the clinic and hospital to which Taylor was brought do not agree as to the date that the fever occurred (two reports indicate a fever on May 29, 1999, one places the fever "about" May 30, 1999, and yet another indicates a fever on June 1, 1999).

The Special Master also rejected the expert reports filed by Dr. Tornatore. She did so primarily, if not exclusively, because Dr. Tornatore had indicated that Taylor developed a febrile syndrome "concurrent with" the onset of her convulsions. Citing an online dictionary, the Special Master concluded that the medical records demonstrated that Dr. Tornatore's statement about the " 'concurrence' of fever and seizures was erroneous." The Special Master did not mention, let alone discuss, Dr. Tornatore's second theory for a causation mechanism—direct toxicity to the nervous system from components of the vaccine, a theory that did not depend upon the presence of a fever. In her decision, the Special Master next strung together citations to a series of six cases in which she had rejected the claims that either whole cell or acellular DPT causes afebrile seizures—however, she did not comment on the extent to which the facts in those cases paralleled those herein and, in particular, did not discuss whether, in any of those cases, a fever occurred near the onset of seizures. Based upon these various findings, the Special Master concluded that "[p]etitioners have not presented a credible prima facie case that DPaT caused Taylor's seizures." On August 1, 2005, petitioners filed their Motion for Review.

## II. DISCUSSION

Under the Vaccine Act, special masters are charged to make vaccine proceedings expeditious, flexible, and less adversarial, but not at the expense of providing each party a "full and fair opportunity to present its case and creating a record sufficient to allow review of the special master's decision." 42 U.S.C. § 300aa–12(d)(3)(B)(iii), (v), Vaccine Rule 3(b); *Hovey v. Sec'y of Health and Human Servs.*, 38 Fed.Cl. 397, 400–01 (1997). Vaccine Rule 8(c) emphasizes that "[i]n receiving evidence, the special master will not be bound by common law or statutory rules of

---

**2.** Defendant's counsel makes various allegations regarding what was said at this conference. But, petitioner's counsel has a different recollection of the hearing. Absent a transcript or some other written record, the court is ill-positioned to resolve this dispute. *See Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed.Cir.1989) (attorney argument no substitute for evidence); *In re Budge Mfg. Co.*, 857 F.2d 773, 776 (Fed.Cir.1988) (statements of attorney are "no evidence"); *see also Sica v. United States*, 325 F.2d 831, 839 (9th Cir.1963) (reviewing court would not take cognizance of unreported statements allegedly attributed to trial judge).

evidence," but rather "will consider all relevant and reliable evidence, governed by principles of fundamental fairness to both parties." Although it has been held that this "fundamental fairness" concept does not incorporate the rigors of the Federal Rules of Evidence, *see Hines v. Sec'y of Health and Human Servs.*, 940 F.2d 1518, 1525–26 (Fed. Cir.1991), it plainly "requires a search for the truth," *Horner v. Sec'y of Health and Human Servs.*, 35 Fed.Cl. 23, 27 (1996). Moreover, consistent with due process, this fairness surely entails notice and an effective opportunity to be heard at a meaningful time and in a meaningful manner.[3]

When deciding a motion for review of a special master's decision, the court may:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2) (2000). Burnishing and combining these standards, the Federal Circuit has stated that this court "may set aside the decision of a special master only if the special master's fact findings are arbitrary and capricious, its legal conclusions are not in accordance with law, or its discretionary rulings are an abuse of discretion." *Turner v. Sec'y of Health & Human Servs.*, 268 F.3d 1334, 1337 (Fed.Cir.2001) (citing 42 U.S.C. § 300aa–12(e)(2)(B); *Munn v. Sec'y of Health and Human Servs.*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992)); *see also Saunders v.*

*Sec'y of Health & Human Servs.*, 25 F.3d 1031, 1033 (Fed.Cir.1994); *Hart v. Sec'y of Health and Human Servs.*, 60 Fed.Cl. 598, 604 (2004). The last of these standards requires the court to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).[4]

Petitioners assault the Special Master's decision on various fronts, but their primary thrust involves her failure to grant them an evidentiary hearing. Respondent is quick to point out that the Vaccine Rules afford the special master discretion in choosing whether to hold a hearing, as they state that he or she "may decide a case on the basis of written filings without an evidentiary hearing." Vaccine Rule 8(d); *see also Plummer v. Sec'y of Health and Human Servs.*, 24 Cl.Ct. 304, 307 (1991). But, behind this discretion are concepts that limit and control. The discretion offered by Rule 8(d), for example, "is tempered by Vaccine Rule 3(b) which requires that each party have a full and fair opportunity to present its case." *Hovey*, 38 Fed.Cl. at 400–01. Under the latter rule, the special master also must ensure that, even without a hearing, a record is created which is sufficient to allow review of the ultimate decision on compensation. *See Hovey*, 38 Fed.Cl. at 401; *Dickerson v. Sec'y of Health and Human Servs.*, 35 Fed.Cl. 593, 598 (1996); *Murphy v. Sec'y of Health and Human Servs.*, 23 Cl.Ct. 726, 730, *aff'd*, 968 F.2d 1226 (Fed.Cir.1992), *cert. denied*, 506 U.S. 974, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992). And a special's master's decision to deny a hearing is still subject to arbitrary and capricious review. *See Hovey*, 38 Fed. Cl. at 401; *see also Burns v. Sec'y of Health and Human Servs.*, 3 F.3d 415, 417 (Fed.Cir.

---

3. *See, e.g., Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (stating that notice and an opportunity to be heard together comprise an "essential principle of due process"); *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) (A fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."); *see also Doty v. United States*, 53 F.3d 1244, 1251 (Fed.Cir.1995)

("When procedural violations committed by the agency are egregiously removed from fairness, this constitutes an abuse of the agency's administrative discretion.").

4. *See also Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105–06, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed.Cir.2000).

1993). Although that review is deferential, the Supreme Court has cautioned that a court applying the arbitrary and capricious standard cannot permit itself to "slip into .a judicial inertia" or mechanistically "rubber-stamp" the prior decision. *Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 97, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983) (quotations omitted); *see also Demutiis v. United States*, 48 Fed.Cl. 81, 87 (2000), *aff'd, as modified*, 291 F.3d 1373 (Fed.Cir.2002).

Petitioners allege that the Special Master abused her discretion in declining to hold an evidentiary hearing while concomitantly: (i) rejecting two affidavits by Taylor's mother, as well as Dr. Tornatore's two reports, essentially on weak credibility grounds; and (ii) adding, *sua sponte*, to the record, three weeks before her decision, a number of articles taken from the Internet without providing petitioners an adequate opportunity to respond to those documents. They also assert that because such an evidentiary hearing was not held, a record does not exist sufficient to review the Special Master's decision. Petitioners ultimately contend that they were prevented from having a full and fair opportunity to present their case in violation of Vaccine Rule 3(b).

Petitioners are right—a conclusion that becomes inescapable if one reviews the Special Master's failure to conduct an evidentiary hearing in light of the other actions she took.

To begin with, there are the various credibility findings that the Special Master rendered regarding the petitioners' affidavits and reports, based upon their alleged conflict with the earlier medical records. It is, of course, true that where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 395–96, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *Montgomery Coca–Cola Bottling Co. v. United States*, 222 Ct.Cl. 356, 615 F.2d 1318, 1328 (1980). And this principle has

been applied in the context of the Vaccine Program. *See Cucuras v. Sec'y of Health and Human Servs.*, 993 F.2d 1525, 1528 (Fed.Cir.1993) ("oral testimony in conflict with contemporary documentary evidence deserves little weight"). But, like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking. As this court has aptly observed—

> The rule should not be applied blindly . . . . Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent. Records which are incomplete may be entitled to less weight than records which are complete. If a record was prepared by a disinterested person who later acknowledged that the entry was incorrect in some respect, the later correction must be taken into account. Further, it must be recognized that the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.

*Murphy*, 23 Cl.Ct. at 733; *see also Camery v. Sec'y of Health and Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate").[5] As these cases suggest, there are, at times, reasons why medical records do not accurately reflect all the symptoms a given patient was experiencing at a particular time—in the case of a young child, a given observation may have been overlooked by the caregiver, particularly under traumatic circumstances, or that symptom may have been relayed, but misreported or not recorded by the medical professional.

■ Given the need to explore such possibilities, Vaccine Rules 3(b) and 8(c), and the principles of fairness that underlie them, counsel in favor of holding an evidentiary hearing where testimony reasonably might shed light on the apparent tension between

---

5. *See also Ale v. Tenn. Valley Auth.*, 269 F.3d 680, 689 (6th Cir.2001) (*U.S. Gypsum* rule inapplicable where documentary evidence was not "unambiguous," but rather "vague"); *Riddell v.*

*Guggenheim*, 281 F.2d 836, 840 (9th Cir.1960) (same where documentary evidence was "equivocal").

medical records and later recorded recollections, particularly where there are ambiguities or lacunae in the former. Applying these rules in this fashion effectuates "the system created by Congress, in which close calls regarding causation are resolved in favor of injured claimants." *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1280 (Fed.Cir.2005); *see also* H.R.Rep. No. 99–908, at 3 (1986); *Knudsen v. Sec'y of Health and Human Servs.*, 35 F.3d 543, 549 (Fed. Cir.1994). It also implements Congress's desire that special masters "be vigorous and diligent in investigating factual elements necessary to determine the validity of the petitioner's claim." H.R.Rep. No. 99–908, at 17. Care must be taken lest evidentiary presumptions—even if, and perhaps because, they are commonly-invoked—short-circuit this system. Indeed, it is easy to carry such presumptions too far: it is one thing, for example, to apply the principle favoring contemporaneous records in assigning weight to oral testimony actually given (or, as in *U.S. Gypsum*, in reviewing fact findings based upon such testimony) and, quite another, to apply the same rule prophylactically, to prevent such oral testimony from being introduced in the first place. The latter ought to occur rarely and only where the contemporaneous records are so clear as to make it highly unlikely that an evidentiary hearing would alter a finding. *See Hale v. Sec'y of Health and Human Services*, 22 Cl.Ct. 403, 408 (1991) ("When all material facts are developed in the motion papers, a full trial is useless. 'Useless' in this context means that more evidence than is already available in connection with [the motion] could not reasonably be expected to change the result.").

■ That is not the case here. The Special Master made short shrift of the affidavits of Taylor's mother even though the various medical records here disagree on basic facts, such as when Taylor had her fever(s) in relation to her seizures. No doubt, some of this confusion is attributable to the fact that the records list her DPT vaccination as occurring on different days, even though the parties agree it was administered on May 27, 1999. Indeed, in referring to the fever, the records use qualifiers like "*about* two days ago" or "no *obvious* fever noted at the time,"

leaving open the possibility that Taylor had a fever at the time she had at least one of her initial seizures. Yet, despite their fuzziness, the Special Master wielded these records as if they were crystal clear. She did so not only in discrediting Mrs. Taylor, but also in rejecting Dr. Tornatore's expert reports. In the latter instance, she viewed the medical records as flatly contradicting Dr. Tornatore's statement that Taylor had a fever "concurrent" with her seizure—going so far as to reject both of the doctor's causation theories, even though the second, involving the vaccine's direct toxicity to Taylor's nervous system, was in no way dependent upon the presence of a fever. In so concluding, the Special Master assumed that Dr. Tornatore meant that the fever occurred "at the same time" as the seizure, citing the primary definition of "concurrent" drawn from the website *www.dictionary.com*. Yet, it is perfectly possible that Dr. Tornatore instead intended to employ the second definition of the term "concurrent" listed on that same website, *to wit*, that the fever was "operating or acting in conjunction with" the seizure. *Id.; see also* The American Heritage Dictionary of the English Language 383 (4th ed.2000) ("concurrent: ... 2. Operating or acting in conjunction with another"). Such an observation would not be inconsistent with the medical records. But, because she did not conduct a hearing, the Special Master neither explored this possibility, nor that some medical experts might view a seizure occurring shortly after a fever to be "febrile," rather than "nonfebrile." In so acting, the Special Master, in the court's view, violated not only the principles of fairness embodied in Vaccine Rule 8(c), but also the specific dictates of Vaccine Rule 3(b), which ensured petitioners a full and fair opportunity to present their case.

Further indication that the Special Master's failure to conduct an evidentiary hearing was arbitrary and capricious may be found in the medical "articles" on afebrile seizures that she *sua sponte* introduced into the record shortly before rendering her decision. The critical question here is—were these articles reliable? Although the Federal Circuit's recent decision in *Althen*, 418

F.3d at 1278–81, makes clear that causation in vaccine cases need not be proven by peer-reviewed literature, that decision did not toss out reliability considerations altogether. *See Walther v. Sec'y of Health and Human Servs.,* 69 Fed.Cl. 123, 126–27 (2005). To the contrary, *Althen,* as well as prior Federal Circuit decisions, teach that the logical sequence of cause and effect showing that the vaccine was responsible for an injury must be supported by a "reputable medical or scientific explanation." *Althen,* 418 F.3d at 1278; *see also Knudsen,* 35 F.3d at 548 ("sound and reliable medical or scientific explanation"); *Grant v. Sec'y of Health & Human Servs.,* 956 F.2d 1144, 1148 (Fed.Cir.1992) (*per curiam* ). Logically, this standard requires a special master to rely on reliable medical or scientific evidence not only in finding causation, but also the lack thereof. *See Hart,* 60 Fed.Cl. at 608–09; *see also* Vaccine Rule 8(c) (requiring the special master to consider "all relevant, reliable evidence"). Indeed, this must be the case, if for no other reason, because the special master can rely only upon reliable evidence in performing the "gatekeeping" function required by *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which the Federal Circuit has held generally applies in vaccine cases. *See Terran v. Sec'y of Health & Human Servs.,* 195 F.3d 1302, 1316 (Fed.Cir.1999); *see also Ryman v. Sec'y of Health and Human Servs.,* 65 Fed.Cl. 35, 40 (2005).

The articles that the Special Master culled from the Internet do not—at least on their face—remotely meet this reliability requirement. Consider the item on "febrile seizures" that she added from the Dictionary of Neurology, *www.explore-medicine.com.* Although that website no longer exists, the exhibit introduced by the Special Master indicates that its information was drawn from Wikipedia.com, a website that allows virtually anyone to upload an article into what is essentially a free, online encyclopedia. A review of the Wikipedia website reveals a pervasive and, for our purposes, disturbing series of disclaimers, among them, that: (i)

any given Wikipedia article "may be, at any given moment, in a bad state: for example it could be in the middle of a large edit or it could have been recently vandalized;" (ii) Wikipedia articles are "also subject to remarkable oversights and omissions;" (iii) "Wikipedia articles (or series of related articles) are liable to be incomplete in ways that would be less usual in a more tightly controlled reference work;" (iv) "[a]nother problem with a lot of content on Wikipedia is that many contributors do not cite their sources, something that makes it hard for the reader to judge the credibility of what is written;" and (v) "many articles commence their lives as partisan drafts" and may be "caught up in a heavily unbalanced viewpoint." The websites from which other articles introduced by the Special Master are drawn likewise warn that "[t]he information provided herein should not be used ... for the diagnosis or treatment of any medical condition," *www.iowahealth.org;* that the sponsor "does not recommend or endorse any specific ... opinions, or other information that may be mentioned on the Site," *www.webmd.com;* or "makes no representation or warranty regarding the accuracy, reliability, completeness, currentness, or timeliness of the content, text or graphics" in its articles, *www.nlm.nih.gov/medlineplus.* And several of these websites caution that reliance on any information provided by the website is "solely at your risk," *see, e.g., www.webmd.com.*

Of course, here the Special Master relied on these materials not at her risk, but at *petitioners'* risk. At the least, an evidentiary hearing would have provided an opportunity for expert witnesses to corroborate or refute the information contained in the articles. Without such a hearing, reliance on these web materials involved an extraordinary risk that cannot be squared with the Special Master's responsibility for conducting a proceeding consistent with the principles of fundamental fairness.[6] And the notion, repeatedly pressed by respondent, that those risks somehow were diminished because the Special Master purportedly allowed the peti-

---

6. The situation here is far removed from that in *Hines,* 940 F.2d at 1525–26, where a special master's reliance on a single medical textbook

(the authoritativeness of which was unchallenged) was deemed permissible under the Vaccine Rules.

tioners 21 days within which to contest the articles has a decidedly hollow ring for at least three reasons. First, it is unclear whether the Special Master actually offered this opportunity—there is no record of this beyond the self-serving assertions of respondent's counsel, which petitioner's counsel flatly contests. Second, even if, as alleged, the Special Master made this offer at the status conference held on June 15, 2005, that was only fifteen days before her decision.[7] Finally, even if one assumes that petitioners were given 21 days to respond to the articles, there is no indication whatsoever that their expert could have considered those sources and responded adequately in writing soon enough to forestall the Special Master from issuing her June 30, 2005, decision. Accordingly, the court finds patently unfair not only the Special Master's initial reliance on the articles in question, but also the half steps she purportedly took after introducing those articles into the record.

In truth, the court does not know to what extent the Special Master actually relied upon these articles, nor what procedures she actually offered petitioners—the former because her decision does not discuss the articles and the latter, again, because the critical conference was unrecorded. These omissions, in themselves, do not square with the Special Master's obligation to provide this court with a record that permits effective

judicial review. Quite the contrary. In fact, the Special Master's June 30, 2005, decision speaks repeatedly in a shorthand that is question-begging and far too cryptic to permit effective review. A classic example of this is the lengthy string cite that was employed for the proposition that "[t]he undersigned has never accepted that either whole cell or acellular DPT causes afebrile seizures." The decision does not explain how these six cases resemble the case *sub judice*. In several of them, the Special Master denied compensation even though the seizures were accompanied by a fever, leaving one to speculate as to what types of symptoms the Special Master believes must accompany a seizure in order to support a finding of compensation.[8] And this is only one of several counts on which the court is left guessing. As such, the written decision here falls short of what is required to permit effective review, itself providing grounds for remand, but also providing further indication as to why the failure to conduct an evidentiary hearing here constituted an abuse of discretion. *See Dickerson,* 35 Fed.Cl. at 601 (failure to articulate specific findings constitutes error; "[d]ismissal without a hearing in this circumstance rises to the level of arbitrary and capricious action"); *see also McClendon v. Sec'y of Health and Human Servs.,* 23 Cl.Ct. 191, 196 (1991).[9]

7. Indeed, the articles in question were attached to a June 9, 2005, order, in which the Special Master rendered preliminary fact findings adverse to the petitioners, certainly giving petitioners the impression that, at the least, they faced an uphill battle in attempting to rebut those articles.

8. *See Bruesewitz v. Sec'y of Health and Human Servs.,* 2002 WL 31965744 (Fed.Cl.Spec.Mstr. Dec. 20, 2002); *Clements v. Sec'y of Health and Human Servs.,* 1998 WL 481881 (Fed.Cl. Spec.Mstr. July 30, 1998); *O'Connell v. Sec'y of Health and Human Servs.,* 1998 WL 64185 (Fed. Cl. Feb.2, 1998), *motion for review denied,* 40 Fed.Cl. 891 (1998), *aff'd,* 217 F.3d 857 (Fed.Cir. 1999), *cert. denied, sub. nom., O'Connell v. Shalala,* 531 U.S. 812, 121 S.Ct. 45, 148 L.Ed.2d 15 (2000); *Haim v. Sec'y of Health and Human Servs.,* 1993 WL 346392 (Fed.Cl.Spec.Mstr. Aug. 27, 1993). *See also* footnote 10, *infra.*

9. Commenting on this requirement in the analogous context of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (1994), the Supreme

Court has stated that, under the arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (*quoting Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). In addition, the Supreme Court has held that while it may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,"* Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), it "may not supply a reasoned basis for the agency's action that the agency itself has not given," *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856 (*citing SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)).

Unfortunately, this is not the first time that this Special Master has so erred—nor the first time that a remand has been ordered, as a result. In *Cook v. Sec'y of Health and Human Services,* No. 00–331V, the Special Master was faced, as here, with a claim that an acellular DPT vaccine had caused afebrile seizures. In denying that claim, again without an evidentiary hearing, the Special Master found statements by the petitioner's mother to be incredible and conclusions reached by Dr. Tornatore—the same—to be "strained and not merited." And she again string-cited cases for the proposition that "[t]he undersigned has never accepted that either whole cell or acellular DPT causes afebrile seizures," and relied, in some unspecified degree, upon Internet articles that she had introduced into the record shortly before issuing her decision. Rejecting these procedures out of hand, this court, in an order dated June 23, 2005, stated that—

> A hearing would have granted both parties their day in court by allowing both parties the opportunity to present expert witnesses on their own behalf and evidence in response to the material the Special Master introduced into the record. Moreover, failing to have the petitioner's mother testify did not provide the Special Master with the ability to reach a reasonable, necessary, and logical decision concerning her credibility. Because the Special Master dismissed the case without the benefit of a

hearing, the undersigned believes that the parties were not offered "a full and fair opportunity to present their case," and fairness would be best served by allowing the opportunity for a hearing. Moreover, the Special Master allowed inadequate time for the parties to respond to her additions to the record, even in writing, when she made the information available to the parties only 12 days and 5 days prior to issuing her decision.

*Cook v. Sec'y of Health and Human Servs.,* No. 00–331V at 2 (Fed.Cl. Jun 23, 2005). Based upon this analysis, this court remanded the matter to the Special Master, finding that the circumstances "necessitate[d] a hearing to allow this court to properly review the credibility assessments made by the Special Master and the record in this case." *Id.*

On remand, the Special Master, now armed with the testimony derived from a full evidentiary hearing, abruptly reversed course on numerous counts—including her ultimate decision. The Special Master found that at least some forms of nonfebrile seizures could be caused by the acellular DPT vaccine. She distinguished the string cite of cases that she had previously relied upon for the proposition that DPT does not cause afebrile seizures, as instead only involving "isolated, afebrile seizure[s] after receiving DPT *without any other symptoms.*" *Cook v. Sec'y of Health and Human Servs.,* 2005 WL 2659086 (Fed.Cl.Spec.Mstr. Sept. 21, 2005) (emphasis added).[10] More strikingly,

---

10. A careful review of the facts in the string-cited cases reveals the highlighted statement to be untrue, as most of the cited cases described other symptoms, including several that involved what apparently were viewed as only "low grade" fevers. *See Borin v. Sec'y of Health and Human Servs.,* 2003 WL 21439673 (Fed.Cl.Spec.Mstr. May 29, 2003) (eye deviation and unresponsiveness hours after DPT vaccination; head CT, EEG and MRI 4 days later showed abnormalities); *Bruesewitz,* 2002 WL 31965744 (patient was shuddering, "not herself," emitted "unusual cr[ies]," seemed tired, had brief periods of unresponsiveness, and had an elevated white count during the first 48 hours after her third DPT vaccination; patient later had seizures with low-grade fevers, but decision rejects compensation, noting that a temperature of 101.1° F is necessary to categorize a seizure as febrile); *Clements,* 1998 WL 481881 (fever of 101.3° F at hospital within 1 hour after seizure on same day as DPT vaccination; seizure held not febrile because it

was not 101.5° F or higher and occurred after the seizure, not before; claimant also was lethargic, experienced vomiting, broncho spasms, coarse respiratory breath sounds, and loose stools); *O'Connell,* 1998 WL 64185 (one day after 2d DPT vaccination, claimant had diminished appetite, was irritable, and suffered fevers of 101.4° F and 101.5°F associated with "jerking movements"; Special Master held jerking movements were not seizures); *Haim,* 1993 WL 346392 (twelve hours after first DPT vaccination, claimant was irritable, very sleepy and eating less; five days later, patient had multiple seizures and a fever of 101° F). It bears noting that in all five of these cases, the Special Master conducted an evidentiary hearing. Of the cases in the Special Master's string cite, the only case that appears to involve no symptoms other than seizures is *Nanez v. Sec'y of Health and Human Servs.,* 2003 WL 22434113 (Fed.Cl.Spec.Mstr. Sept. 23, 2003).

perhaps, in distinguishing her prior cases, the Special Master relied primarily upon the testimony of Dr. Tornatore—whom she had earlier found incredible and whom she found incredible here—finding that his explanation of the effect of the DPT vaccine "is credible and manifests a logical sequence of cause and effect." *Id.* at 13. Moreover, there is not the slightest hint in her remand opinion that she continued to rely upon any of the articles that she found while surfing the web. Ultimately, contrary to her first summary finding, the Special Master concluded that "[p]etitioner is entitled to reasonable compensation." *Id.*

Respondent attempts to blunt the accumulated force of these many concerns by serving up a many-colored splendor of palliatives, generic invocations of discretion, and blithe claims of harmless error. For example, it drily contends that *Cook* is distinguishable because, there, the Special Master gave the petitioners only 12 days to respond to her articles, but here allowed a full 21 days for that response. But, such distinctions are without a difference. Fundamentally, respondent utterly fails to come to grips with the fact that the procedures employed by the Special Master compounded error upon error, lacked fundamental fairness, and hence were arbitrary and capricious. One can only imagine how respondent would react if the situation were in reverse, that is, if a special master introduced into the record unverified medical articles browser-clipped from the Internet, gave respondent, via an unrecorded status conference, 15 days to respond, and then, without an evidentiary hearing, found respondent's expert witnesses incredible— and on that basis awarded compensation. When posed this hypothetical at oral argument, respondent's counsel had no ready reply. The response, of course, is—what is not good for the goose cannot be good for the gander.

## III. CONCLUSION

This court need go no further. As Justice Cardozo once said, "[t]he concept of fairness

11. *Snyder v. Massachusetts,* 291 U.S. 97, 122, 54 S.Ct. 330, 78 L.Ed. 674 (1934) (Cardozo, J.).

12. This opinion shall be unsealed, as issued, after February 13, 2006, unless the parties, pursuant to Vaccine Rule 18(b), identify protected and/or

must not be strained till it is narrowed to a filament." [11] Here, one must search to find even such a thread. While the court understands that exposure, over years, to dozens of cases involving similar issues might tempt one to take a "cookie cutter" approach to resolving causation issues, such an approach remains the antithesis of the individualized determinations required by the Vaccine Program.

For the foregoing reasons, the court finds that the Special Master acted in an arbitrary and capricious fashion in rendering her decision. The petitioner's motion for review, therefore, is **GRANTED**. The Special Master's Entitlement Decision of June 30, 2005, is hereby **VACATED** and this matter is **REMANDED** to the Office of Special Masters for further proceedings consistent with this opinion. Pursuant to Vaccine Rule 28, the period of this remand shall not exceed 90 days. [12]

**IT IS SO ORDERED.**

privileged materials subject to redaction prior to said date. Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction.